UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

**FILED**

FEB 0 8 2006

CLERK

JERIMYAH LITTLE,                    )          CIV.  03-5103
                                    )
        Plaintiff,                  )
                                    )     MEMORANDUM OPINION
    vs.                             )          AND ORDER
                                    )
EDWARD RODRIGUEZ, JOHN OLSON,       )
SEAN DOYLE, RICHARD FOX and         )
CHRIS DeGROOTE, as Rapid City Police)
Officers,                           )
                                    )
        Defendants.                 )

Pending before the Court is a Motion for Summary Judgment [doc. #131], by the

Defendants and a Counter Motion for Summary Judgment [doc. #142], by the Plaintiff.  All

briefing is complete and this matter is ripe for disposition.  For the following reasons, the

Court grants the Defendants' Motion for Summary Judgment and denies the Plaintiff's

Counter Motion for Summary Judgment.

## INTRODUCTION

On October 20, 2003, the Plaintiff, Jerimyah Little, filed a Complaint against several

defendants, including Edward Rodriguez, John Olson, Sean Doyle, Richard Fox, and Chris

DeGroote, officers with the Rapid City Police Department.  The Court will refer to these

Defendants by name, or as "the Defendants" when discussing them collectively.  The

Complaint alleges a section 1983 claim, as well as pendent state constitutional violations and a

state negligence action, stemming from the Plaintiff's arrest and detention on October 22,

2000.  On August 11, 2004, the Court granted Little's motion to amend the Complaint to

clarify his claims and to add a claim for punitive damages.  The Court denied Little's motion

to amend to include the names of several "Doe" defendants.  Finally, the Court granted a

motion to dismiss by the Rapid City Police Department and the Pennington County Sheriff's

Department [doc. #74].  On September 27, 2004, the Court dismissed Third Party Defendants

Jackson Nursing Services, Deann Myers, Sheryl Jackson, and Charlene Williams [doc. #102].

On September 30, 2004, the Plaintiff filed an Amended Corrected Complaint [doc. #108].  The

Defendants answered the Amended Corrected Complaint on October 5, 2004 [doc. # 110].

The Defendants moved for summary judgment on July 1, 2005, the motion deadline.  On

August 1, 2005, one month after the deadline, Little filed his Counter Motion for Summary

Judgment.

## FACTUAL BACKGROUND

On July 10, 2000, Rapid City Police arrested Little as a minor consuming alcohol and

for his involvement in a disturbance.  On the evening of October 21, 2000, Little was at his

mother's home at 1120 Nowlin Street in Rapid City.  That night, Little drank about eighty

ounces of beer and two shots of whiskey.  Little decided to walk to a nearby Exxon station.

During his walk, he encountered five males and a female, who began to chase Little because

they thought he had stolen CDs and other items from their car.  Little ran to his mother's house

and stayed inside.  The individuals who chased Little came to the outside of the house,

threatening him by saying, "Come out.  We're going to kill you.  Going to get you.  Come on."

After about thirty minutes, scared for his siblings' safety, Little went outside the house

carrying his twelve-gauge shotgun.  Little testified in his deposition that he held the shotgun

with its barrel pointed at the ground, telling the individuals to leave his yard, and they

responded by screaming at him.  However, Little admitted during an interview with Detective

2

DeGroote that he did point the shotgun in the air next to the individuals involved in the altercation.  One of the individuals, Eric Roesler, hit Little in the front of Little's mouth with Roesler's right elbow or right fist.  Roesler eventually took off running with Little's shotgun.  One individual in the group shouted that they were going to call the police, so Little ran into the house knowing the police were on their way.  Little put his siblings in the back room of the house, then washed himself of the blood on his face and shirt.  Little did not remove the shirt although it had blood on it.  According to Little, within a minute of his reentry into the house, the police arrived.

Officers Olson, Rodriguez, and Doyle and Sergeant Fox responded to a fight at 1120 Nowlin Street shortly after 1 a.m. on October 22, 2000.  Little did not respond to the officers' knocks on the door.  After about five minutes, the officers called Little on the telephone.  Officer Rodriguez identified himself as a police officer, then told Little he needed to open the door or come outside.  Little responded that he wanted to wait until his mother returned because he did not want the officers taking his family away from him.  Little's mother returned home soon thereafter and, from outside the house she called to Little to come outside.  Little came out of the house, and Officer Rodriguez arrested him at 2:33 a.m., putting handcuffs on him and placing him in the back seat of Rodriguez's patrol car.  During the entire night, Officers Olson and Doyle and Sergeant Fox had no direct contact with Little.

Little is "pretty sure" that, while in the patrol car, he told Officer Rodriguez that he needed to go to the hospital because he was bleeding from his mouth onto his shirt and the back seat of the patrol car.  In response, Officer Rodriguez told Little he did not need to go to the hospital, to which Little did not respond.  Little was able to swallow some of the blood, but

3

some of the blood was coming out of his mouth.  Little testified he had blood on his shirt and hands, as well as what he thought was a six-inch circle of blood on his pants.

Little and Officer Rodriguez did not talk during the trip to the police station.  At the station, Little was taken directly to an interview room while still handcuffed, where he waited for five to ten minutes before anyone came to talk to him.   Little testified that, when an officer came in the room, he had blood on his shirt, face, and hands; his mouth was still bleeding; and he was still swallowing blood.  The blood on Little's hands, mouth, chin, cheeks, shirt, and pants was dried.  Little's shirt had drips of blood down the chest.  However, the video tape of the interview shows Little did not have dried blood on his cheeks, chin, mouth, hands, or shirt during the interview.  Little does not distinctly remember telling the officer that he was hurt, that he had loose teeth, that he was bleeding, that he was in pain, or that he needed to go to the hospital, but thinks he may have told the officer about several of these things.  During the interview, Little felt pain in his mouth, but he does not remember whether he told the officer.

The video tape of the interview shows Little remained asleep for about fifty-three seconds after Detective DeGroote loudly entered the interview room.  Little was not handcuffed during the interview.  Detective DeGroote conducted a 27-minute, video-taped interview of Little, during which Little drank water several times, rested his head and chin on his hands several times, and rested his cheek against the palms of his hands several times.  During the interview, Little never asked Detective DeGroote for any type of medical care, never indicated his teeth were loose, never stated he was in pain, and never stated he had any kind of physical problems.

4

After the interview, a male detective took Little to a police car that was going to take Little to the Juvenile Services Center ("JSC"), but did not talk to Little during the walk there. Officer Rodriguez took Little to the JSC, but did not talk to Little during the trip. Little was in the custody of either Officer Rodriguez or Detective DeGroote for nearly two hours, from 2:33 to 4:24 a.m., when Little was booked into the JSC. From the time the officers arrived at his mother's house, at approximately 1 a.m., until he was booked into JSC, Little remembers only telling Officer Rodriguez about his mouth at the time he got into the patrol car, and of that conversation, Little is "pretty sure" he told Officer Rodriguez.

Dr. Michael Crutcher, a dentist in charge of the dental program at the Sioux San IHS Hospital, was the first doctor Little remembers seeing regarding his loose teeth. However, Little actually saw Dr. Charles Robinson first, on October 30, 2000. Little came into the hospital complaining of two loose, bleeding, front teeth. Little reported to Dr. Robinson that he had been hit in the mouth ten days earlier. After examining Little's teeth and looking at x-rays, Dr. Robinson found one of Little's teeth was highly mobile and the facial plate was fractured. Dr. Robinson opined that Little's loose teeth could not be fixed or restored.

Dr. Crutcher first saw Little on October 31, 2000, and had a full face view x-ray taken to make sure there were no more fractures in Little's mouth. Dr. Crutcher removed both upper front teeth and the necrotic (dead) bone to which they were attached. The doctors at the Sioux San IHS Hospital told Little and Little's mother the dentists possibly could have saved his two front teeth had he been brought in earlier, because the earlier the treatment after a trauma, the higher the success rate, as the fractured bone and teeth could have been splinted for proper healing. Dr. Crutcher opined that he would not have been able to conclude that Little had a

5

broken bone above his two front teeth by merely talking to Little, but could only so determine after clinical examination, x-rays, and moving the teeth. This is so because Little's teeth were still in his mouth, the broken bone was behind the gum, below Little's nose but above the two front teeth. Further, the gum tissue was intact. Only x-rays helped Dr. Crutcher see behind the intact gum tissue to find the break. Dr. Crutcher also stated he would not expect a lay person to be able to determine the bone was broken merely by talking to Little. The danger to Little, according to Dr. Crutcher, was pain and infection, but Little still would have been able to eat with the bone broken, though Little would have had to change how he ate.

On December 18, 2000, Little's attorney sent a letter to the Finance Office of the City of Rapid City, stating he was acting on behalf of Little and Little's mother, Wanda Siers. The letter continued: "Please take notice that Jerimyah Little [Siers] suffered injuries from an altercation resulting in his arrest on or about July 10, 2000. Despite his obvious injuries, Jerimyah did not receive adequate medical care after his arrest and being transported to the Juvenile Services Center by Officers of the Rapid City Police Department, which resulted in the loss of two permanent teeth." Finally, the letter stated it was being served upon the finance officer "pursuant to SDCL 3-21-2 and 3."

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment should issue, the facts and inferences from those facts are viewed in the light most favorable to the nonmoving party, and

6

the burden is placed on the moving party to establish both the absence of a genuine issue of

material fact and that such party is entitled to judgment as a matter of law.  Id.; Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Once the moving party has

met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by

affidavit or other evidence must set forth *specific* facts showing that a genuine issue of material

fact exists.  In determining whether a genuine issue of material fact exists, the Court views the

evidence presented based upon which party has the burden of proof under the applicable

substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

The Supreme Court has instructed that summary judgment "is properly regarded not as

a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole,

which are designed to 'secure the just, speedy, and inexpensive determination of every action'"

Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  The

nonmoving party "must do more than show that there is some metaphysical doubt as to the

material facts," and "[w]here the record as a whole could not lead a rational trier of fact to find

for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 586-87.

## DISCUSSION

### A.    Local Rules

Pursuant to this Court's local rules, LR 56.1(B), "there shall be annexed to the motion

[for summary judgment] a separate, short, and concise statement of the material facts as to

which the moving party contends there is no genuine issue to be tried."  Local Rule 56.1(C)

requires that "[t]he papers opposing a motion for summary judgment shall include a separate,

short, and concise statement of the material facts as to which it is contended [by the opposing

7

party] that there exists a genuine issue to be tried.  The opposition shall respond to each numbered paragraph in the moving party's statement with a separately numbered response and appropriate citations to the record."  The Plaintiff's opposition to the Defendants' motion did not comply with these local rules.  Local Rule 56.1(D) provides, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."  However, the Plaintiff's brief opposing summary judgment contradicts some of the Defendants' Statement of Material Facts.  Although it makes the Court's work decidedly more difficult, the Court will excuse the Plaintiff's failure to comply with the local rules in this instance and will consider the facts in light of the Plaintiff's brief, as best the Court can decipher.

Additionally, however, the Plaintiff failed to comply with LR 56.1(B) and (C) with regard to his "counter motion for summary judgment."  The Plaintiff also filed his "Counter Motion for Summary Judgment" on August 1, 2005, one month after the deadline to which the parties stipulated for such motions.  See doc. #s 114 & 115.  For these reasons, the Court will deny the Plaintiff's "Counter Motion for Summary Judgment" [doc. #142].  See Fed. R. Civ. P. 16(f) (granting Court authority to enforce its pretrial and scheduling orders).

**B.      Section 1983 Claim**

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  S.J. v. Kansas City Missouri Pub. Sch. Dist., 294 F.3d 1025, 1027 (8th Cir. 2002) (citation omitted).

8

The Defendants move for summary judgment based on qualified immunity.  Under this doctrine, government officials generally are shielded from civil liability so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). "Qualified immunity is an immunity from suit rather than a mere defense to liability, which is effectively lost if a case is erroneously permitted to go to trial." Avalos v. City of Glenwood, 382 F.3d 792, 798 (8th Cir. 2004) (citations and internal quotations omitted).  "Qualified immunity is available 'to all but the plainly incompetent or those who knowingly violate the law.'" Id. (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Id. (citation omitted).

The initial inquiry in the qualified immunity analysis is this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001). If the facts alleged demonstrate a constitutional violation, the second inquiry "is to ask whether the right was clearly established;" that is, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 201-02.  Third, the Court must determine if, taking the facts in the light most favorable to the Plaintiff, "there are no genuine issues of material fact as to whether a reasonable official would have known that the alleged actions violated that right." Foulks v. Cole County, 991 F.2d 454, 456 (8th Cir. 1993).

The Defendants concede the Plaintiff has met the first two prongs, to wit: the Plaintiff has alleged a deprivation of a constitutional right, and that right was clearly established at the

time of the facts giving rise to his claim.  The Defendants contend they are entitled to qualified immunity, however, because a reasonable official would not have known the actions violated clearly established law.  Specifically, the Defendants argue the Plaintiff did not have a serious medical need and, even if he did, they were not deliberately indifferent to that need.

In a deprivation of medical care case, a prisoner can show his Eighth Amendment rights were violated by proving prison officials were "deliberately indifferent to the inmate's serious medical needs."  Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997); Spencer v. Knapheide Truck Equip. Co., 183 F.3d 902, 905 (8th Cir. 1999).  Because the Plaintiff was a pretrial detainee, however, he was beyond the power of the State to punish, and the Court analyzes his claims under the Fourteenth Amendment, rather than the Eight Amendment.  Id. Although the Eighth Circuit "has yet to settle on a clearly binding standard" regarding pretrial detainees, "the Supreme Court has held that pretrial detainees are entitled under the Fourteenth Amendment to 'at least as great' protection as that afforded convicted prisoners under the Eighth Amendment."  Spencer, 183 F.3d at 906.  Thus, the Court will analyze whether the Plaintiff had a serious medical need, and whether the Defendants were deliberately indifferent to that need.

An objectively "serious medical need is 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'"  Coleman, 114 F.3d at 784 (quoting Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995)).  "When an inmate alleges that a delay in medical treatment constituted a constitutional deprivation, 'the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment.'"  Id. (quoting Crowley v.

10

Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997)).  A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain."  See Helling v. McKinney, 509 U.S. 25, 32-33 (1993).  A serious medical need is one "that may be life threatening or pose a risk of needless pain or lingering disability *if not treated at once*."  Davis v. Jones, 936 F.2d 971, 972 (7th Cir. 1991) (emphasis added).  "An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed."  Crowley, 109 F.3d at 502 (citation omitted).

        In this case, the Court concludes the Plaintiff has not shown he had a serious medical need.  Because the Plaintiff did not have a doctor's diagnosis regarding his injury, the Court must analyze this claim under the "layperson's" test.  Under this test, the injury must be "one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention."  Coleman, 114 F.3d at 784.  The Plaintiff did not alert the Defendants to any pain he felt.  The video tape of the interview reveals that, at different times while in the interview room, the Plaintiff was sleeping or resting his cheeks and chin on palms of his hands, did not complain of pain or loose teeth, and did not ask for medical assistance.  The Plaintiff has not presented evidence to show the two-hour period he was in police custody was an "acute or escalating situation" requiring "immediate attention," or "that the delay in treatment aggravated his condition."  Givens v. Jones, 900 F.2d 1229, 1233 (8th Cir. 1990).  The Plaintiff also has not shown the injury was "life threatening or pose[d] a risk of needless pain or lingering disability if not treated at once."  Davis, 936 F.2d at 972.  To the contrary, Dr. Crutcher testified the Plaintiff could have been taken to a dentist up to forty-eight hours after

11

the injury and received a good result from treatment.  Further, Dr. Crutcher testified he had to

examine the Plaintiff's teeth, manipulate them, and take x-rays to find the problem, before

determining the teeth needed to be removed.  Dr. Crutcher testified a layperson would not have

been able to recognize and determine the Plaintiff had sustained the injuries he had.[1]  Thus, the

Plaintiff's injury was not "one that is so obvious that even a layperson would easily recognize

the necessity for a doctor's attention."  Coleman, 114 F.3d at 784.  Accordingly, the Plaintiff

has failed to demonstrate he had a serious medical need.

However, even if the Court were to conclude the Plaintiff had a serious medical need,

the Plaintiff's section 1983 claim would still fail, because he has failed to show the officers

were deliberately indifferent to such medical need.  In the Eighth Amendment context (and,

pursuant to Eighth Circuit precedent, in the Fourteenth Amendment context), deliberate

indifference is analogous to criminal recklessness.  Farmer v. Brennan, 511 U.S. 825, 839-40

(1994).  Deliberate indifference includes more than negligence, but less than actual intent to

harm; "it requires proof of a reckless disregard of a known risk."  Coleman v. Parkman, 349

F.3d 534, 539 (8th Cir. 2003).  "To establish a constitutional violation, it is not enough that a

---

[1]Rather than contradicting statements in the Defendants' Statement of Material Facts on this issue, the Plaintiff instead primarily attacks a small number of incorrect citations contained in the Defendants' Brief, and in so doing avers that the Defendants are incorrect in their recitation of the evidence.  Although the Defendants' Brief contained a few incorrect cites to numbered paragraphs supporting particular arguments, the paragraphs supporting the arguments are very near those actually cited (often in the very next paragraph or two).  In a deceptive manner, the Plaintiff attempts to cast the situation as one in which the Defendants incorrectly recite the evidence when, in actuality, the Defendants merely had cited the wrong paragraph numbers.  The correct paragraphs supporting the Defendants' assertions were very nearby those incorrectly cited.  The Plaintiff's action, an attempt to lead the Court to believe evidence did not support the Defendants' arguments, was inappropriate and unacceptable.

reasonable official should have known of the risk, a plaintiff must establish that the official in question did in fact know of the risk." <u>Gregoire v. Class</u>, 236 F.3d 413, 417 (8th Cir. 2000). The Court must view deliberate indifference from the defendant's perspective at the time in question, "not with hindsight's perfect vision." <u>Jackson v. Everett</u>, 140 F.3d 1149, 1151 (8th Cir. 1998).

With this standard in mind, the Court turns to address the facts of this case. The Plaintiff offers no evidence that his condition was so open and obvious that even a layperson would recognize the necessity for immediate medical attention. Further, the evidence before the Court indicates just the opposite. The Plaintiff refused to come out of his mother's house for nearly 1½ hours after the officers arrived. As outlined above, the Plaintiff, though he claims to have been in extreme pain, remained asleep for nearly a minute after Detective DeGroote loudly entered the room and tried to wake the Plaintiff. When questioned about being hit, the Plaintiff describes the hit, but did not claim he was in pain or had a broken bone, and did not request to be taken to a hospital. The Plaintiff sat and calmly talked to Detective DeGroote throughout the interview without mentioning pain, the need to go to a hospital, or blood coming from his mouth, gums, or teeth. The Plaintiff rests his head, his cheeks, and his chin on his folded arms and on the palms of his hands, not evincing any pain during any of these positions. Although the Plaintiff alleges he informed some officers about his desire to go to a hospital, the Plaintiff did not inform them that his teeth hurt, or that any of the officers should examine his mouth to see the injury to the facial plate or teeth. The Defendants did not have any indication that the Plaintiff had suffered a broken facial plate, but only that he had been in a fight. The Defendants did not have actual knowledge of any alleged serious medical

13

need by the Plaintiff.  The Plaintiff's own actions belie any assertion that he had a serious

medical need.  Therefore, the Defendants were not deliberately indifferent to that alleged need.

Further, the Plaintiff testified that Dr. Crutcher said he "could have saved [the teeth] if

[the officers had] brought [the Plaintiff] earlier."  While true, Dr. Crutcher also testified that

the success rate for treating a condition like the Plaintiff's is better the earlier the treatment,

and that he could have saved the Plaintiff's teeth had he been brought to Dr. Crutcher within

forty-eight hours.  The two-hour time period during which the Plaintiff was in police custody

did not cause the loss of the Plaintiff's teeth.  The Plaintiff makes much of Detective

DeGroote's statements regarding the Plaintiff having been punched in the mouth.  That the

Defendants, including Detective DeGroote, knew the Plaintiff had been punched in the mouth

does not bolster the Plaintiff's arguments that the officers were indifferent to his medical need.

Rather, it undermines the Plaintiff's argument, because it shows the officers may have known

only that the Plaintiff's upper lip was swollen due to being hit, as people normally swell from

such an injury, rather than from the unusual occurrence of suffering from a broken dental bone

as a result of being hit.  In sum, the Plaintiff has failed to present evidence that any of the

officers were deliberately indifferent to any alleged serious medical need.  Thus, because the

Plaintiff has failed to show he had a serious medical need, and that the Defendants were

deliberately indifferent to that alleged serious medical need, the Defendant are entitled to

qualified immunity, and summary judgment must be entered in their favor.

**D.    State-Law Claims**

Having resolved the Plaintiff's federal claim, the Court must determine whether it

should exercise supplemental jurisdiction over the Plaintiff's state-law negligence claim and

his claim for violation of state constitutional rights under Article VI, Section 23 of the South Dakota Constitution. Federal courts may decline to exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(c)(3), if the Court has dismissed all claims over which it has original jurisdiction. In exercising this discretion to decide whether to adjudicate pendent state claims, relevant considerations for the Court are issues of judicial efficiency, convenience, and fairness to the parties. <u>United Mine Workers v. Gibbs</u>, 383 U.S. 715, 726 (1966); <u>Condor Corp. v. St. Paul</u>, 912 F.2d 215, 221 (8th Cir. 1990). The Defendants are entitled to summary judgment on the section 1983 claim, the only claim by the Plaintiff that fell within the Court's original jurisdiction. The Plaintiff appears to concede the statute of limitations likely has expired on his negligence claim, and his claim based on the South Dakota Constitution appears to be a novel issue of state law. The Court declines to exercise jurisdiction over these remaining claims, which are based on the laws of the State of South Dakota.

## CONCLUSION

The Plaintiff has failed to present evidence that he had a serious medical need, as that term is defined in this Circuit. The Plaintiff also has failed to present evidence that the Defendants were deliberately indifferent to that alleged serious medical need. Because the Court will grant summary judgment to the Defendants on the Plaintiff's section 1983 claim, and because that claim is the only one over which the Court had original jurisdiction, the Court declines to exercise supplemental jurisdiction over the Plaintiff's state-law claims. Accordingly, it is hereby

ORDERED that the Defendants' Motion for Summary Judgment [doc. #131] is GRANTED.

15

IT IS FURTHER ORDERED that the Plaintiff's Counter Motion for Summary Judgment [doc. #142] is DENIED.

IT IS FURTHER ORDERED that the Plaintiff's claims arising under the laws of the State of South Dakota are dismissed without prejudice.  The Court will enter a separate Judgment, consistent with this Memorandum Opinion.

Dated this _8 th_ day of February, 2006.

BY THE COURT:


ANDREW W. BOGUE
SENIOR DISTRICT JUDGE